Thank you, Your Honor. I may please the Court. The District Court erred in granting summary judgment to the City on plaintiffs' important constitutional claims for two reasons. First, as this Court held in Bell 1, plaintiffs have at minimum established a genuine factual dispute, precluding summary judgment with regard to their standing to bring their claims for prospective relief. Second, under the particular facts of this case, the principles articulated by the Supreme Court in Heck v. Spencer do not bar plaintiffs' claims for either prospective relief or damages under Section 1983. Can you just clarify who the plaintiffs are, shortest appeal? Right, so we've got two sets of plaintiffs. We've got Martin and Anderson, who are continuing to push claims for prospective relief. And then there are an additional set of plaintiffs who, along with Martin and Anderson, are pursuing retrospective relief, essentially damages and related relief. Thank you. Sure. So I'd like to be clear. All of those people, I think Martin maybe was once cited but not convicted, but the other people, the people who are only seeking damages, all have convictions. Yes, the individuals who are only seeking damages all have convictions. So your argument about Heck is just an argument that they were incarcerated for such a short time that they, what, they couldn't have appealed? No, not necessarily. So I think it's helpful with respect to Heck to take a step back and understand what it is that the Supreme Court was trying to accomplish in that line of cases. And essentially what the Court is dealing with there is a conflict, or is an attempt to address the interplay between Section 1983 and the Habeas Statute. I think we know this. Sure, sure. I know you're familiar with it. But the idea is that they're recognizing that Congress has enacted a more specific statute, the Habeas Statute, to deal with situations in which a prisoner is challenging the validity or conditions of their confinement. And so what the Court did by creating an exception to the otherwise broad reach of Section 1983 in Heck was to say, look, we're really concerned about a situation in which someone is attempting to proceed through Section 1983 to obtain relief, which would, in effect, necessarily establish the invalidity of their conviction or the length of their confinement, without going through all the procedural prerequisites that Congress envisioned in the Habeas Statute. And in this instance, as I understood it, in order to bring a habeas, they would have to exhaust each other's jail law remedies. And they didn't. Except that habeas is inapplicable to these individuals because they were never in custody. But Dana, they were never in custody? They were never in custody. I thought they were in custody for time serving. Okay, so again, I'm sorry, there's two sets of individuals. But most of the plaintiffs in this case, including the ones who are just seeking retrospective damages, were never in custody. They were sentenced to time serving. There's only one of the six plaintiffs. But time served is custody. Well, they were never actually in custody pursuant to a judgment of the state. That's simply part of their sentence. And there were individuals, for example, both Martin and Anderson. Martin's two convictions, one of the convictions he was sentenced to a $75 fine. The other one he was sentenced to community service. So at least with respect to him, he was never in custody at all. Okay, but you're, just tell me why you don't think that footnote in Lyle or however we're supposed to say that case. I mean, your colleagues in the other case, I think, more or less conceded that their claims for retrospective relief are barred and asked us to basically try to get Lyle overruled, but in this case, on bond. And that is how I read the footnote. So why do you think it doesn't? So I think part of the challenge comes because there's two different approaches that the Supreme Court has articulated in terms of how to address the scope of the heck inception. One was Justice Scalia's approach for the majority in heck itself, and one is the approach that Justice Souter took at Spencer. And I think it's important to understand that we're making an argument that Lyle did not raise. And you're essentially asking us to get an odd bank hearing. No, no, not at all. I think there's two considerations. I mean, first of all, we think that Lyle doesn't cover this case because of the fact that what Justice Scalia explains the court is doing at heck is essentially it's incorporating common law principles into Section 1983 to say that ordinarily, under the common law, you can't bring a second tort action that would have the effect of imputing the validity of a criminal conviction. But that is not true under the common law when that initial criminal proceeding was one in which there was neither a full or fair opportunity to litigate or adequate incentive to litigate. Well, there most certainly was an opportunity. Your clients could have taken a direct appeal, and I think, in fact, one of them. They actually could not have because, pursuant to their plea agreements, there was no opportunity there. Oh, well, okay, then fine. That's even worse. No, but I think what the Idaho Supreme Court has explained in the Anderson case is that they specifically looked at this in the context of a Section 1983 claim. And they said when an individual is faced with a minor misdemeanor, there is no, in those situations, there's not adequate incentives to litigate. It might be an incentive, but there is a possibility. So the question is are we looking at incentives or possibilities? Well, I think the common law requires both, both a full and fair opportunity to litigate and adequate incentive. Otherwise, you don't bar someone from filing a second action. I don't think the common law says anything about incentives. I think it might question if you somehow don't have an opportunity. But I don't know. Is there some case? No, yeah. I mean, I would point you to the Supreme Court's case in Haring v. Proceeds, where it talks about this very issue, both in terms of the context of full and fair opportunity to litigate and adequate incentives to litigate. The context of a malicious prosecution, I imagine. No. No. I mean, that's what I'm saying. You're trying to say that you're right, that. That was a 1983 action. I mean, but you're right that in Heck, what the majority did, at least, was to incorporate principles from common law malicious prosecution actions. And so that's what I'm asking. Well, so, okay. So that's an important question, Judge Wofford. And I think it's important to understand, I think, that in Heck, although the Court does reference malicious prosecution, if you look at footnote 4, what Justice Scalia explains is that they're pointing to malicious prosecution only as illustrative of the general common law toward principles. So it's not as though the Court is incorporating the favorable termination requirement from the malicious prosecution context full stop. And the reason we know that is because, I was just going to say, at common law, favorable termination, it wasn't enough, for instance, that the state would just drop its suit against you. You actually had to show a favorable termination on the merits, for instance, at trial. That's not the way that Heck rules. Let's go back to Lyle. Yeah. Everything you're saying, I mean, Lyle seems to me to be binding care. And tell me why it is. So two things I would say, Your Honor. I think one difference between Lyle in this case is that in Lyle, the individuals were actually in custody. And so even if you read Lyle as — There's a footnote. Court judges inability to obtain federal habeas relief is no fault of his own. He was in custody for only two days after his arrest, and was not sentenced to any prison time as a result of his infraction conviction. So it's exactly the same. Yeah. Again, Your Honor, I mean, to be clear, we think that Lyle is not the right reading of Spencer. But I do think that — but to be clear, I do think that there's no cause to extend it even further. If what Heck is — this is the last thing I'll say, and then I'll move to some of the other Heck issues and the standing issue. But I think the one thing I would say is that if we accept, and I think everybody in this courtroom does, that what Heck is designed to do is to eliminate tension between Section 1983 and the habeas statute, there's simply no cause to apply the Heck rule in a situation in which someone was never in custody. And at least with respect to some of our cases — But there's a footnote that says it's exactly the same. But he at least was in custody. He was in custody after his arrest, but before his conviction, as I understand it. Yeah. I mean, again, I would just say it's clear that in Lyle they're extending a prophylactic rule as far as it can go. I would just suggest this Court doesn't extend it further. But whether or not you view Heck as barring the retrospective claims, we certainly think that Heck doesn't bar the other claims in this case. Well, on this one, I think you're insufficiently brave in the sense that I don't think Heck has anything to do with prospective relief as to other incidents and other convictions. The fact that there was an earlier conviction. And I think the issue preclusion world is exactly why. I mean, he didn't — in order to have issue preclusion, you have to have litigation. He did litigate it earlier. He doesn't get — if you think about it as claim preclusion, it's not claim preclusion, because he's talking about different facts and different incidents. And I just — I've never seen Heck — as far as I know, there is no case applying Heck to that kind — to prospective relief that has nothing to do with the earlier conviction. I don't know of any case. Do you know of any case? No. So you're trying to argue something much narrower, and I don't know why. Well, I mean, I think you could imagine circumstances in which a claim for prospective relief would — As if it was trying to affect the earlier conviction, but it's not. Yeah, but here it's not. I mean, here, plainly, Your Honor, it's not. And it's not because it's — if, for example, you have somebody is charged with a crime, and he doesn't attack the statute under which he's convicted, and he's convicted. And then he's charged with the same crime again. Can't he now challenge the conviction? The constitutional validity of the — I mean, it would certainly be disturbing if he could not. Yeah. And I think here, you know, as you're pointing out, I mean, not only do we have that here, but we have the fact that the whole question of the constitutionality of the city's enforcement of the ordinance turns on facts that change over time. And so if this court — That's what I'm saying. I don't think that matters at all. It does. And maybe it's just additional gravy here, but I think that there's a variety of reasons why — And moreover, for some reason that I also don't understand, everybody is thinking that — everybody seems to agree that he can nonetheless go forward for the same relief under the Declaratory Judgment Act. So I don't know why that would be. If there was a problem, it would be a problem with regard to other statutes. Yeah. I mean, you know, that is interesting. The courts really haven't addressed the application of HEC in the Declaratory Judgment Context quite as much. Why would it make any difference? Yeah. I mean, the Declaratory Judgment Statute, as I understand it, is just a box. Yeah. For — you still need a cause of action. And the cause of action under the Declaratory Judgment Act is still 1983, as far as I'm concerned. I mean, I think — yeah, I mean, it's also the case that it's possible that the — I mean, now the district court obviously said Declaratory Judgment Act can go forth, and the city hasn't challenged it on that base. So it all doesn't matter. But — There's one way or another you can get the prospective relief and everything. I mean, I think it does matter, though, just to be clear, that we have the 1983 claims, because the nature of declaratory judgment relief is much more discretionary, and so I think it is important for us to have the 1983. So assume you get past this. Okay. Yeah, so — There's a lot more to talk about on the merits, so maybe move to that. Move to the merits? Yeah, yeah, yeah. Yeah, I mean, I think, well, certainly on the merits, you know, we view the city — the court's case in Jones to be very interesting here. Do you feel the merits — should we reach the merits here? We still have the standing problem. Yeah, I mean, I think that — I meant the merits of the standing. Oh, the merits of the standing. You don't have the merits before. Yeah. If you have a decision saying your claims don't have standing. So then — so two things, then. One, quickly before addressing that, I just want to make clear that we do have one plaintiff who's differently situated in terms of his retrospective claims, and that's Martin, the conviction that he actually wasn't convicted of. We think the record is quite clear that that claim was raised in the complaint, and therefore that he is entitled to pursue that. So I don't understand the city to dispute that Heck has no application to Martin's citation, which was dismissed. And so that being the case, we think at minimum that should be remanded, whatever you do with the remaining claims, on which you are free to call for en banc if you agree that the lie was probably — Now, in terms of the standing, so let's talk about the standing. We think here that plaintiffs have put in more than sufficient evidence to establish that they face a credible threat of prosecution under the ordinance. First of all, we pointed to substantial evidence that the homeless population of Boise substantially exceeds the available shelter beds that are available within the city. In the last point in time count in 2016, there were roughly 900 homeless individuals just identified by that count, and there are only 350 shelter beds and then 100 additional emergency shelter mats. So you do the math and — Yeah, and I guess I was inclined to think that doing the math there was irrelevant, because for whatever reason, a bunch of people could just voluntarily decide that they don't want to avail themselves of a shelter bed, and that wouldn't excuse, it seems to me, an individual plaintiff who, you know, could have gone to the shelter because there were beds, they hadn't run out of space, who nonetheless decided to sleep on the street. Yeah, I mean, I think that Jones is sort of recognizing some of the practical realities that go into that decision. So if you're in a — let's say that you're in a city where the homeless population substantially exceeds the capacity of the shelter beds, you have to make a decision very early in the day, especially if you're in a town like Boise, where most people who — many of the people who are sleeping outside are going to sleep up in the hills, not right next to where the shelters are. And so you have to make a determination based on whether you think you can get into that shelter on that day. And that's a determination — it's not as though these people are walking around, can look in a nap and say, you know, is this shelter full, is it not full? And many of these people are trying to — you know, they might be doing panhandling, they might be trying to work towards, you know, earning income that they can use to eventually stay at home. And so I think what the court is doing in Jones is it's recognizing that whether you're convicted under the statute shouldn't turn under the vagaries of whether one person at the end of the day decides not to attend. Well, there's a lot of specific evidence in this record about these kinds of practicalities. I mean, for example, as I recall, one of these people said that if he goes to the sanctuary, which is the one that he prefers, they have some kind of waiting list, and until he — and they don't get through the waiting list until it's essentially too late to go to the other place. Right. That's exactly right. So you could easily have a situation in which you are trying to get to a shelter. It turns out that that shelter is unavailable, and you can't make it to the other one. But I think the other thing to keep in mind here is that it's not just here, at least from a standing perspective, it's not just the question of what the overall balance is between the homeless population and the shelter capacity of the city, because plaintiffs have pointed to evidence that at least when — that on nights when shelter was unavailable to them, regardless of whether other individuals could have accessed the shelter, that the city was citing them. And that's at page 6. Well, for standing purposes, though, you need at least one plaintiff, right, who I guess did not have shelter available to them. Yeah, and both Martin and Anderson have pointed to instances in which they were cited in circumstances where they — Not after 2014, though, and that's the period we're concerned about. Well, I mean, I think the reason for that is because this case has been on appeal since 2015. In the very last period before this case was on appeal, the — oh, I'm sorry, you're referring to the amendment to the ordinance? The change, right? Actually, so there's no change at all, and I think that's important to understand. The city has, as explained in their brief at page 24, and this is really undisputed in the record, that they continue to follow the shelter protocol in order to determine when there is available shelter space within the city. And the way that that — But see, this is what's odd about it. As a result, what you're really challenging is your shelter protocol. In other words, I mean, they say our policy is we're not going to cite anybody if there was not space available, if they couldn't have slept in the shelter. And — but the way they're enforcing that is by this — having the shelters call them, and they don't seem to have more discrete information than that. So if there were injunction, but everything you're saying is true, the injunction would have to focus on the way they determine whether there is space or not, right? I mean, I just think the — I think the injunction very simply would prohibit the city from enforcing the ordinance in circumstances where there's a lack of available shelter. Right, but they have — but they say, well, we're doing that. Here's the system we have. So it's really their system that you're challenging. I mean, we're certainly saying that their pattern of enforcement is insufficient, yes. And I mean, that would be the case no matter what. I mean, if the city amended its statute tomorrow and said, we will interpret this statute not to violate the Eighth Amendment, but then continue to enforce it in exactly the same way, we would still be here seeking an injunction, you know, requiring them not to enforce the law in circumstances where, you know, an individual is being forced to sleep outside without any — you know, without any opportunity to find shelter. I mean, I would — oh, go ahead. I'm sorry, Judge. Just help me with this, because I guess I thought it distilled down to a very simple factual question, and that's whether we're going to count the bed space available at — is it River of Life? Is that the other shelter? Because if you — according to the record we have before us, they say that we've never been full ever, at least in the last relevant time period. Yeah. And so if you count the bed space available there, then none of your clients could prevail, right? No. So I think two things, Your Honor. First of all, if you look at page ER272B of the record, that is information from the Boise Rescue Mission about how many individuals were staying at River of Life. And you'll see, for instance, if you look at January 3, 2014, that on that day it lists 200 people as being in the emergency shelter, even though they themselves acknowledge that their capacity is 188. So there is evidence in the record that Boise Rescue Mission does get full. But they've never turned anyone away. No, but at that point you're not talking about available shelter space. It may be that they can find places in the hallway for somebody to stay. But also your clients say that they were turned away. I'm sorry? Your clients say that they were turned away from that location. Yeah. Because they say if we stay one night and not the next, and they don't let us come back the night after, so we were turned away. And then they say, well, and if you stay more than 17 days, then they make us go to this religious thing. So they were turned away for that. And then somebody else. I mean, your clients specifically say they were turned away from that place. I think that's right. So I think the second thing I was going to say, and I think that this maybe is the answer from staying. And, again, we're here on summary judgment, where it's only about whether we can establish a genuine dispute. We've pointed to evidence in the record that because of the 17-day rule, for instance, Mr. Anderson was cited after he was required to leave Boise Rescue Mission because his 17-day state limit had expired. They also say that if you go one day and don't come back the next day, then they turn you away. And you're out for 30 days as well. Right. And the reality is that people are going in and out of Oklahoma. So I pointed to ER 678-81 in the record, and also ER 136-137, where the police report specifically expressly says that Mr. Martin can't access either of the shelters, and yet he was still given a citation. So that shows that the way that the city is enforcing this is subjecting them to a credible threat of constitutional injury. All right. We have time to stop. We'll give you two minutes. Thank you. Good morning, Your Honors. Please, the Court, Madam Clerk, and Counsel. I would like to address first the standing issue, because I think that goes right to the heart of this case and will do away with the prospective relief claims under Section 1983, because you still have to have standing. Mr. Martin and Mr. Anderson absolutely lack standing to prosecute the prospective relief claims. It is very well established that they must prove that they have a substantial risk that they will be cited in the future on some night when there is no shelter space available to them. Now, this case is very similar to the Munns v. Cary case, as well as the City of Los Angeles v. Lyons case, in that there is, and has always been, a very long string of contingencies, a chain of events that must first occur before they will ever be cited, convicted, of violating the camping or the disorderly conduct ordinances in Boise. I would like to address those first chain of events, and in doing so we can talk about a lot of the specific factual issues within each one. The first one here that must have to occur, which is obvious. I'm sorry, I'm not understanding what you're saying. The must what? The first chain of events that must occur in our line here is that in the future, at some point, Mr. Martin and Mr. Anderson must become unsheltered in Boise. Now, is it probable? Is it possible? Certainly. The city is not saying that that's not going to happen. One of them has moved away, I recognize that. The other one, how that person is, as far as we know, still homeless, right? In Boise. Well, he's not unsheltered, Your Honor. That's the key distinction here. Someone needs to find themselves with nowhere to go. That's the distinction. Now, Mr. Anderson testified that, I believe since 2007 time frame, 2009 time frame, he spent maybe one or two nights unsheltered. And the pure fact was because he was embarrassed to go to one of the shelters. I didn't understand him to be saying that. He did say that at that point he was, but I didn't understand that that was the only two nights that he was unsheltered. Unsheltered in that he was illegally camping, Your Honor, that he did not have a shelter to go to. He understood that there were only two nights ever that he, well, I didn't get that. As far as that plaintiff goes, Your Honor, that is correct. Now, the second issue is that even if they find themselves unsheltered with nowhere to go, there must be no shelter space in Boise that they can avail themselves of. The shelters in Boise have never concurrently been full on any night to our knowledge. Well, but that's in dispute. First of all, it depends what you mean by full, right? Because the mission, River of Life, is that what it's called? River of Life. Apparently has people sleeping on the floor and so on. And there was some indication that there were fire hazards and so on. So that's a problem. And go ahead. Well, Your Honor, there are allegations that that was a problem, but the evidence on the record is undisputed that the fire chief from the city has come and said you can do this. You have the ability to put up to 40 individuals on mats, which are the same mats that are used on the beds, and put them in the dining room. I thought there was something about the fire person said something they were doing was not right. Maybe it was in the other shelter. Absolutely not, Your Honor. There's no evidence on the record. In fact, the evidence on the record is that it has been approved, and they are able to do that. But secondly, whether they think they're full or not, the record does establish that these individuals at times were not able to go there. Not due to a lack of space, Your Honor. And that's what matters, the fact that they're not able to go. If they're not able to get a shelter, for example, because they slept there one night and not the night after and then they can't come back, that doesn't count. Your Honor, it matters if they could have availed themselves of that space. And the Eighth Amendment here is concerned with the inability, the absolute involuntary. And if they're there for 17 days and they throw them out, would your position be that they have to go to this religious training place? Absolutely not, Your Honor. And in fact, the position would be. And one of them says that they were, in fact, thrown out after 17 days. Well, they would then have an obligation to go and attempt to seek shelter at another facility, including the sanctuary, which, Your Honor. That's the only other shelter. For men, correct. Which, based on 2014 numbers, which we believe is completely consistent with the other years, men have, they have only been full, two men, on 25% of the nights. Meaning that on 75% of the nights, they could go and they could obtain that shelter. I thought it was 40% of the nights. I'm sorry, Your Honor. I thought it was 40% of the nights. No, plaintiffs are picking a bigger number to say that that applies to men and women. Our plaintiffs here in this case are both males. It's 25% of the nights. And, Counsel, all the numbers that we're throwing around now,  Absolutely, Your Honor. So, we have not had, I guess, a full factual airing of all of these numbers, correct? Well, we did, Your Honor, up until the point that the judge ruled on the record before. I understand that at the summary judgment stage we did. Right. But we have not had an actual fact finder determine which version is correct. Right? Outside of the summary judgment context. Well, Your Honor, we argue that it's undisputed. Our evidence as to when the shelter is available and when it is not is undisputed. Those numbers are not undisputed. Right. I mean, I think the other side does dispute them. I think that's why we keep having this 40% they're taking the bigger number. I mean, has there actually been a jury or a judge saying, as a matter of fact, this is what happened, as opposed to ruling on summary judgment, which the standard, as you know, is different. Well, no, Your Honor. There has not been a factual finder determine when those shelter beds are available. However, again, the evidence is undisputed that sanctuary on 25% of the nights in 2014 was full demand, and that River of Life has never had to turn any mail away for lack of shelter space. Now, I do want to address Judge Berzon's question regarding the 17-day requirement. Under that circumstance, if you are forced out or asked to leave the River of Life because you've extended the 17-day requirement, which, by the way, it's undisputed, it is not enforced all year. It is only in selective cases. But if you are asked to leave and you leave, you then can go access shelter at the sanctuary. If that is full and an officer finds you camping because you have nowhere else to go, you will not be cited. Let me ask you something. I'm looking at the affidavit from the sanctuary official, and she says sanctuary has been at its best capacity in the men's area at least half every month. So this is an example of the fact that you're giving us facts and they're giving us facts. This is from the sanctuary. What was the year on that? Let me see. And I'm not quite sure what you're referencing. 2010. 2010? Is that a declaration or an affidavit of approval? A declaration or an affidavit, yes. Yes, it is. Okay. Well, that was 2010. Since 2010, which are really the facts in dispute here before the court, it's 25% in 2014 as far as sanctuary availability. Now, Your Honor, if someone is unable to find shelter space in Boise due to a lack of space, they looked. They went to the sanctuary. The sanctuary is full. They went to the River of Life. The River of Life said, sorry, we're full. And if that occurs, or if they go back to the facility and they say, well, you can't stay here because of the 17-day requirement, which would only be applicable at the River of Life, they will not be cited. An officer who happens to discover that individual camping or sleeping in public will not issue them a C-type citation. The ordinance that was, let me back up. It has always been the policy of the city of Boise not to cite anyone at night when shelter space is unavailable to that person. In 2014, that policy was specifically amended into the ordinance. And it reads here, Your Honor, that law enforcement officers shall not enforce this ordinance when the individual is on public property and there is no available overnight shelter. Since everyone has been keeping track of the record here, and in this discovery process, the city has provided all of the citations and all of the complaints to the plaintiffs. There is not one instance where someone has been cited at night when there is no available shelter space to that individual. The city has a shelter protocol, which is also now in written agreement with the various shelters, who cooperate and agree that they will call the city and notify them at 11 o'clock p.m. every night if they are full. And there's no evidence on the record that that system has ever failed. There's also no evidence that the Boise Police Department dispatch has ever failed to send notification to its officers on any night that a facility is full. Can I ask you a slightly different question about the River of Life? Yes, Your Honor. Even for the folks who are just staying less than 17 days, is there a factual dispute as to whether the religious atmosphere, even for the less than 17-day folks, it's just too, I don't know how to put it, but you know what I'm saying? You shouldn't even count the beds available there, because basically that would be sort of compelling people to stay in a religious environment. Absolutely not, Your Honor. There is no evidence at the River of Life that anyone, as a condition of receiving temporary overnight shelter, is compelled or otherwise required or even expected to participate in any religious activity. I think there was evidence about that, too. Maybe it was old. I'm sorry, there was specific, either Martin or Anderson said specifically, although it might refer to an earlier period, that he was required to go to religious services. Well, if you keep reading in that, I then ask him at that deposition, Mr. Anderson, were you actually forced to go to that? No, I was not. No, I thought that was a different. It was an expectation if you were to go into the programming portion, which is up there. My understanding is that there were different depositions at different points, and at one point he specifically said that he did have to go to religious services. I'm not aware of any of that, Your Honor. And as far as I know, neither of these individuals have ever actually gone to chapel. There's no requirement that they go to chapel. I wasn't even talking about being compelled to go to chapel, because I think that, as you conceded earlier, that would be obviously problematic. I'm talking about the rest of what goes on there. It's a very, I mean, the whole mission of the place seems to be to convert the folks who come at the door to the really, I can't even remember what. As are, well, let me rephrase it. As are many various shelters, there may be a religious component or other community service-oriented approach there. The other shelter here that we've been talking about is called the Interfaith Sanctuary. There is a religious base there with donors, but no one is compelled to recognize God, as is required in the Inuit case about attending an alcoholic anonymous. And counsel has put pictures of what they've called religious paraphernalia and said, well, look, someone might have to see this. But there's no evidence on the record that Mr. Anderson or Mr. Mark were ever even offended by that or that they even recognized it. And that alone in and of itself does not require them to recognize God, to believe in a God, to have proselytizing speech about it. And there's absolutely no expectation that anyone at that shelter even believe in God. And Mr. Anderson had testified that on his form he put that he had no religion. Mr. Martin is a self-professed pagan, and he himself experienced what he phrased as no more than subtle nudges from other guests. Maybe this is not the right analogy, but I was trying to envision a public school that had as much religious infusion as this shelter does. And we wouldn't say that the state could compel students to attend a school, even though they weren't required to go to chapel or participate affirmatively in any kind of religious activities. Nonetheless, just being forced to spend your day in that kind of an environment would be problematic from a constitutional standpoint. And I guess I don't see why wouldn't the same analysis apply here? Well, it potentially are, but I don't think the facts on the record here show that there is any sort of day-to-day religious aspect at this facility. I mean, it's not as though there's facts on the record that the second you walk in, there's someone greeting you and saying, take God into your heart, that there's nothing in there. The application form itself explicitly refers to. He says, we would like to share this with you, but you are not required and not expected to do that. One of the things that Anderson said was that when he's staying at the mission, he can't go over to the Corpus Christi, which is the day place, because it's Catholic and they're not allowed to do that. And was that in his 2010 deposition? That was in 2014 deposition, I think. Let me see. Your Honor, I would like to. I mean, the point, the larger point is there's a lot in this record at this point which pulls in different directions on a lot of these points. I mean, I just found another declaration from the sanctuary woman that says something that says, essentially, we are full fairly consistently in all seasons of the year. So you're saying one thing, and the record has contrary information, it seems to me. Well, I would disagree, Your Honor, and the point, though, that we need to emphasize on is even if all of the shelters were full, on any given night, the city of Boise will not cite anyone. That is specifically in their ordinance. So if all the shelters are full, they will not be citing anybody. It's irrelevant. And I don't think we can really get lost in the fact that. But the way they know whether the shelters are full is they rely on self-reporting. Yes, Your Honor. Right. And Mission Place says we never turn anyone away, but we know they do. For lack of a state. Well, so they turn them away. Right, Your Honor. They don't turn anybody away for lack of state. Okay, but they turn them away. So how would any officer know, I mean, if they're relying on this document, it says we're not turning anybody away for lack of space. We know they are turning people away. Well, the officers have a habit, and this is in the testimony, Your Honor, in particular of Blake Slater and Tom Shuler, where they say that they have a habit of going to the shelter. When they encounter an individual camping who says, yeah, I can't stay at that shelter, well, come on, Mr. Martin, let's go walk over there and let's make sure that's true. Oh, no, Mr. Martin can stay at this shelter. Your Honor, those are the kind of things that officers need the discretion to do to make sure that the process is working. And there is no evidence here that this process is breaking down. Counsel has been unable to find a single citation or complaint in the record over the last years where it suggests that someone has been sighted at night when there's no shelter space available. And fourth, Your Honor, in this contingency of events, there must be a conviction. They can raise these defenses, and they are entitled to and expected to raise defenses at the stage of their criminal prosecution. Your Honor, the city contingency. Do you want to talk at all about the hack issues? I do, Your Honor. And briefly, on the issue of, it appears that counsel is trying to, is asking this court to create an exception to Heck v. Humphrey, one that the Supreme Court has never recognized, one that the Ninth Circuit has never recognized, that in a situation where someone has not had the full and fair opportunity or incentive to litigate, that Heck should not apply. Now, I want to address two issues with that. Not only is that completely irrelevant under Heck v. Humphrey, but there is no evidence on the record here that plaintiffs, in this case, did not have a full and fair opportunity to litigate or incentive. They were facing misdemeanor charges, which included jail time. They had lawyers. And plaintiffs, in their complaints, in this case, have spent significant time, including an entire section in their complaint, talking about the various serious alleged detrimental effects that a conviction has on a homeless person's ability to find employment, to find housing, and to secure benefits. There's no evidence on the record that any one of these individual plaintiffs did not have a full and fair opportunity to litigate the constitutionality of their citations on their convictions. They could have appealed as well, but they did not. They could have used, as was similar to the case in Lyle, a post-conviction relief that was provided by the State of Idaho, but they did not do that. What the plaintiffs are asking is for this Court to create an exception that would essentially eviscerate Heck v. Humphrey. What about for prospective relief? Your Honor, if they lack standing, then I claim fells in and of itself. As I understand it, the district court held that Heck also brought the prospective relief. I think under 1983, but not the Declaratory Judgment Act, which I don't understand. My understanding of that, Your Honor, is that Heck v. Humphrey only applies to 1983. It does not apply, but that's what the judge has said. I know that's what he said, but it doesn't make any sense. I mean, there was something wrong with it. Right. I think the thing to focus on here is that the plaintiffs were allowed to proceed under Section 1983 with their prospective relief claims, but that would necessarily imply the invalidity of their prior convictions, especially when they're saying don't do it. No, it wouldn't. I mean, because they didn't raise it before, so they're not invalid. If they're saying under the same circumstances, which they are. Not really. But if you have, again, the same hypothetical, if somebody is charged under a statute and doesn't challenge his constitutionality and is convicted, and then they're charged five years later under the same statute, can they now challenge the constitutionality of the statute? Of course they can. If they're alleging different circumstances. No, if they're alleging the same circumstances, because it's not the same conviction. Your Honor, I don't think that that's fully dispositive of this issue. Mr. Martin and Mr. Anderson lack standing, and I do understand that amount of time, but they do lack standing. And on the Heck v. Humphrey issue about creating an exception, what they're asking for is that any context, any criminal proceeding, whether it's infraction or misdemeanor of this sort, that the criminally charged can simply walk in and say I plead guilty and then walk out of that state courtroom, walk right over to the federal courthouse and file an action under 1983 saying I want damages for that, I want my record expunged, I want this court to declare that that was unconstitutional and I want to challenge that city ordinance, even though they did absolutely nothing. But it is true that they couldn't file federal habeas at that point. Correct, Your Honor. But as Lyle says, it's absolutely irrelevant, because they did not utilize any of their other opportunities to challenge that ordinance, which, heck, did not say that you only have to use the habeas. There were three other opportunities or vehicles by which you could challenge it. Thank you very much. Thank you, Your Honor. Thank you for your useful argument, sir. I just want to make a couple of points. I think as this Court has heard, there are a significant amount of factual disputes that go to the question of standing. And at summary judgment, we're entitled to the benefit of every factual inference in our favor. These are the kinds of disputes that should be resolved at trial, not here at summary judgment. With respect to the religion issues, I heard my friend acknowledge that sanctuary is full. There's a dispute about how often it's full, but we know that it's full at least a significant percentage of the time. And I also heard that whether the BRM should be considered constitutionally available space depends on whether it's a religiously coercive environment. Their main argument is that you're not compelled to enter into prayer. But frankly, I think it's a remarkable assertion that that's where the line is drawn. Well, Henderson said, I looked again, in 2014, that he was compelled to go to chapel. That's what he said. Yeah. He had to pray, but he had to go. Yeah, and that's right. No, it's true, but it's what he said. Yeah, and if you look at ER 442, ER 476, 77, there's allegations by the plaintiffs about the significant pressure to engage in religious services there. It's undisputed in the record that both in the rules and in the intake form, with which you're confronted when you first enter into the shelter, that you're told that religious services are encouraged. And frankly, I think it's remarkable that in a situation where you're compelled to go to a self-acknowledged, pervasively religious environment, where you're encouraged to attend sectarian services, and if you don't, you're going to subject yourself to criminal prosecution, I think it's remarkable to say that there's not a genuine factual dispute about whether that's problematic. And also, we're told, after 17 days, if you don't enter into religious programming, you have to go out on the streets. The last thing I'll say is that the relevant merits inquiry here is not whether there – it is ultimately whether you're being forced to stay outside involuntarily. And whether that's because there's not available shelter space, whether that's because the shelters are only open to people who are male or female, or only open to people of a particular religion, the ultimate question is whether you're being subject to prosecution involuntarily. We have pointed to evidence in the record that that happens. ER 136 to 137 and ER 678 to – I'm sorry, 478 to 81 are instances where both Martin and Anderson received a citation, even though it was acknowledged that there was no shelter available to them. And we think that, at minimum, that creates a genuine dispute with regard to whether they have standing to bring their claims for prospective relief. Thank you. Thank you very much. The case of Martin v. City of Boise is submitted. And we will take a short break. Thank you. Thank you.
judges: Berzon, Watford, Owens